Filed 5/11/21  P. v. Johnson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>THOMAS JOHNSON,<br><br>        Defendant and Appellant. | D076966<br><br><br>(Super. Ct. No. SCE359485) |

APPEAL from a judgment of the Superior Court of San Diego County, Evan P. Kirvin, Judge.  Affirmed in part; reversed in part and remanded with directions.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

During the first phase of a bifurcated trial, a jury found Thomas Johnson guilty of numerous offenses, including carjacking (count 2; Pen. Code, § 215, subd. (a)),[1] kidnapping (count 3; § 207, subd. (a)), robbery (count 8; § 211), attempted robbery (count 9; §§ 664 and 211), and evading an officer with reckless driving (count 10; Veh. Code, § 2800.2, subd. (a)).[2] During the second phase of the trial, the trial court found that Johnson had suffered four prior Illinois convictions that were serious felonies under California law (§§ 667, subd. (d), 1192.7, subd. (c)) and found true four strike conviction allegations (§§ 667, subds. (b)–(i); 1170.12) and four serious felony conviction allegations (§ 667, subd. (a)(1)) premised on those four convictions. Johnson subsequently filed a motion for new trial based on alleged jury misconduct. The trial court denied the motion and sentenced Johnson to a total term of 66 years plus 81 years to life in prison.

On appeal, Johnson claims that the trial court erred in declining to hold an evidentiary hearing on his motion for new trial. In the alternative, Johnson claims that his counsel provided ineffective assistance in failing to support the new trial motion with juror affidavits. We conclude that the trial court did not err in denying Johnson's request for an evidentiary hearing on his motion for new trial and Johnson has not established that his counsel provided ineffective assistance in connection with the motion.

---

[1] All subsequent statutory references are to the Penal Code, unless otherwise specified.

[2] We describe the charges, allegations, verdicts, true findings, and sentence in detail in part II.B, *post*.

Johnson also claims that three of the four prior Illinois convictions do not qualify as serious felonies under California law (§§ 667, subd. (d), 1192.7, subd. (c)) and thus, that the trial court's true findings on the strike (§§ 667, subds. (b)–(i); 1170.12) and serious felony allegations (§ 667, subd. (a)(1)) must be reversed.[3] Johnson notes that the trial court acknowledged that there "there was no direct, specific, explicit evidence," of two of the requisite elements to qualify those convictions as serious felonies under California law. Johnson further notes that the trial court stated that it inferred "that those elements were present in the factual basis for each of the serious felony prior[ ]" and on the basis of such "inference . . . [found] that all the elements of the California statutes have been met." Johnson argues that, in imposing an enhanced sentence based on factual findings that the court expressly stated were based the court's own "inference[s]," the trial court violated Johnson's Sixth Amendment jury trial right under *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*).

We agree that under *Gallardo* a trial court is prohibited from making factual findings that were not made by the jury or admitted by the defendant in the prior case. (See *Gallardo*, *supra*, 4 Cal.5th at p. 136 [in determining whether a prior conviction constitutes a strike or serious felony under California law "[t]he court's role is . . . limited to identifying those facts that were established by virtue of the conviction itself—that is, facts the jury was necessarily required to find to render a guilty verdict, or that the defendant admitted as the factual basis for a guilty plea"].) There is nothing in the record establishing that a jury found, or that Johnson admitted, all of the

[3]     Johnson does not raise any challenge to the trial court's finding that his prior Illinois conviction for attempted *armed* robbery in case No. 04CR1883101 constituted a strike conviction (§§ 667, subds. (b)–(i); 1170.12) and a serious felony conviction (§ 667, subd. (a)) under California law.

3

facts necessary to establish that any of the three challenged Illinois convictions constitutes a serious felony under California law (§§ 667, subd. (d), 1192.7, subd. (c)).[4]  In light of *Gallardo*, we are compelled to conclude that there is not substantial evidence in the record to support the trial court's true findings that the three challenged Illinois convictions constitute strikes and serious felonies under California law.

While Johnson requests that we vacate the challenged true findings and remand for resentencing, the double jeopardy clause does not preclude the People from retrying the reversed prior conviction allegations, if they elect to do so.  (See *People v. Monge* (1997) 16 Cal.4th 826, 843; accord, *Gallardo*, *supra*, 4 Cal.5th at p. 138.)  Accordingly, while the record does not currently contain evidence that would support true findings on the three challenged strike and serious felony allegations, we conclude that the People should be afforded the opportunity to retry those allegations if they can obtain additional evidence and choose to retry Johnson on the allegations.

Accordingly, we reverse the judgment for the limited purpose of permitting the retrial of the reversed strike and serious felony conviction allegations if the People so elect, resentencing Johnson,[5] and preparation of a new abstract of judgment.

---

[4]    Specifically, as we explain in part III.B, *post*, there is no evidence in the record that in entering guilty pleas in the prior Illinois proceedings, Johnson admitted possessing the requisite specific intent for any of his Illinois convictions to constitute a serious felony under California law.

[5]    In resentencing Johnson on remand, the trial court shall consider the unchallenged true findings that Johnson suffered a prior Illinois conviction for attempted armed robbery in case No. 04CR1883101 that constituted a strike conviction (§§ 667, subds. (b)–(i); 1170.12) and a serious felony conviction (§ 667, subd. (a)).  (See fn. 3., *ante.*)

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

1. *Johnson kidnaps B.B. and steals his truck*

On March 28, 2016, at approximately 2:00 p.m., Johnson approached B.B. in a parking lot and threatened to stab him with a needle contaminated with AIDS unless B.B. gave Johnson a ride in his truck. Feeling as though had no choice, B.B. complied. Johnson got into B.B.'s truck, pulled out three needles, put them to B.B.'s neck, and told B.B. to start driving. Johnson forced B.B. to drive around to various places for approximately 45 minutes. While stopped at a stoplight, B.B. was able to escape from the truck Johnson got in the driver's seat and drove away.

2. *Johnson robs 75-year-old Martha E.*

That same day, Johnson drove B.B.'s truck into a store's parking lot. 75-year-old Martha E. (Martha) was walking in the lot. Johnson approached Martha and asked her for directions to a store. While speaking with Martha, Johnson grabbed Martha's purse and pulled it off her shoulder. Martha tried to hold on to the bottom of the purse, but Johnson managed to take it from her as he drove away.

3. *Johnson attempts to rob Pamela S.*

Later that evening, at around 9:20 p.m., Pamela S. (Pamela) drove to a store. While Pamela was walking from the store to her car, Johnson drove up to her in B.B.'s truck. Johnson lunged out of the window and tried to grab Pamela's purse from her left arm. While holding onto her purse, Pamela stabbed at Johnson with her car keys, cursed at him, and yelled, "Police, police, help, I'm being robbed!" Johnson abandoned his efforts to steal the purse and drove away. A bystander called 911.

5

4. *Johnson leads police on a high-speed vehicle chase before crashing and being arrested*

At around 9:30 p.m. that same evening, Johnson led police on a high-speed chase in B.B.'s truck.  Johnson eventually crashed and police arrested him.

B. *Procedural background*

1. *The charges and allegations*

In a second amended information, the People charged Johnson with kidnapping during a carjacking (count 1; § 209.5, subd. (a)); carjacking (count 2; § 215, subd. (a)); kidnapping (count 3; § 207, subd. (a)); robbery (counts 4 and 8; § 211); assault with a deadly weapon (count 5; § 245, subd. (a)(1)); making a criminal threat (count 6; § 422); unlawful driving or taking of a vehicle (count 7; Veh. Code, § 10851, subd. (a)); attempted robbery (count 9; §§ 664 and 211); and evading an officer with reckless driving (count 10; Veh. Code, § 2800.2, subd. (a)).

As to counts 1 through 4 and 6, the People alleged that Johnson used a deadly weapon during the commission of the offense (§ 12022, subd. (b)(1)). As to count 8, the People alleged that the victim was 65 years of age or older and that Johnson had previously been convicted of the crime of robbery (§ 667.9, subds. (a) and (b)).

 Finally, as described in greater detail in part III.C.2.a, *post*, the People alleged that Johnson had suffered four prior Illinois convictions and that each of these convictions constituted a strike (§§ 667, subds. (b)–(i); 1170.12) and a serious felony (§ 667, subd. (a)(1)) under California law.

2. *The jury's verdicts*

The jury found Johnson guilty of carjacking (count 2; § 215, subd. (a)); kidnapping (count 3; § 207, subd. (a)); making a criminal threat (count 6; § 422); unlawful driving or taking of a vehicle (count 7; Veh. Code, § 10851,

subd. (a)); robbery, (count 8; § 211); attempted robbery (count 9; §§ 664 and 211); and evading an officer with reckless driving (count 10; Veh. Code, § 2800.2, subd. (a)). As to the charge of assault with a deadly weapon (count 5; § 245, subd. (a)(1)), the jury found Johnson guilty of the lesser included offense of simple assault (§ 240). The jury also found true the special allegation that Johnson committed the robbery alleged in count 8 against a person who was 65 years of age or older (§ 667.9 subd. (a)).

The jury found Johnson not guilty of kidnapping during a carjacking (count 1; Pen. Code, § 209.5, subd. (a)); robbery (count 4; § 211); and assault with a deadly weapon (count 5; § 245, subd. (a)(1)). The jury also found not true the deadly weapon allegations (§ 12022, subd. (b)(1)) attached to counts 2, 3 and 6.[6]

3. *The trial court's true findings on the prior conviction allegations*

As described in greater detail in part III.C.2.c, *post*, the trial court found that Johnson was the person who had suffered the four prior Illinois convictions. The court also found that each of the prior convictions constituted a strike and a serious felony under California law. In addition, the court found true the special allegation attached to count 8 that Johnson had previously been convicted of a robbery (§ 667.9 subd. (b).)

4. *The sentence*

The trial court sentenced Johnson to a total term of 66 years plus 81 years to life in prison. The court sentenced Johnson to a determinate term of six years on count 10. In addition, the court sentenced Johnson to indeterminate terms of 29 years to life plus 20 years on count 2, 27 years to life plus 20 years on count 8, and 25 years to life plus 20 years on count 9.

---

[6] In light of its not guilty verdicts on counts 1 and 4, the jury did not return verdicts as to the deadly weapon allegations attached to these counts.

7

The court stayed execution of the remaining sentences and allegations pursuant to section 654.

III.

DISCUSSION

A. *The trial court did not abuse its discretion in denying Johnson's request for an evidentiary hearing on his motion for new trial, nor did the court "effectively" refuse to hear the motion for new trial*

Johnson claims that the trial court abused its discretion in denying his request for an evidentiary hearing on his motion for new trial based on alleged juror misconduct. Specifically, Johnson claims that the trial court's "action in misleading defense counsel to believe a juror affidavit would be incompetent evidence to support the motion," entitled Johnson to an evidentiary hearing at which he could present testimony in support of his motion. Alternatively, Johnson contends that the trial court "effectively" refused to hear the motion for new trial, in violation of section 1202.

    1. *Factual and procedural background*

        a. *Johnson's petition for the release of juror information*

In July 2019, several months after the jury returned its verdicts, Johnson filed a petition for the release of juror information in order to permit defense counsel to pursue an investigation into possible juror misconduct. In a supporting brief, Johnson stated the following:

> "On March 6, 2019, the jurors returned a verdict of guilty against [Johnson]. While the verdict was read, a few jurors seemed upset. After seeing the juror was so upset the defense investigator went to contact some jurors.

> "In speaking with Juror [No. 2], he made a number of startling statements regarding the subject of their deliberations. First, he stated that he was appalled by some of the behaviors and views of the jurors. He stated that some of the jurors decided Mr. Johnson was guilty before starting deliberations because of the color of Mr.

8

Johnson's skin. Also[,] some of the jurors stated they were prejudiced against Mr. Johnson because of the color of his skin. Additionally, the jurors discussed and considered the fact Mr. Johnson did not testify."

Johnson also stated in his brief that "Juror [No.] 2 was unable to sign to [a] declaration."

Johnson attached a declaration from a defense investigator who had interviewed Juror No. 2 in May 2019. The investigator stated that Juror No. 2 "stated that the older white female jurors had already decided that [Johnson] was guilty based upon his skin color." The defense investigator also stated:

"I asked [Juror No. 2] if any of the jurors talked about Johnson not testifying at the trial. [Juror No. 2] said it was discussed several times. In particular[,] it was discussed that several jurors believed that it was weird that they never got to hear the defendant's side of the story. They also stated that if Johnson had testified, they believed it could have helped his defense."

The People filed an opposition to the petition. In their opposition, the People argued that Juror No. 2's claim that several older white females based their verdict on Johnson's "skin color," was implausible because Johnson was himself "clearly a white male." The People also argued that the "the validity of the entire proffered statement allegedly given to the defense investigator is called into doubt when considering [defense counsel] sent the investigator out to have the juror sign the declaration but the investigator was unable to do so."

9

b. *The August 2 hearing during which defense counsel advised the court that Juror No. 2 refused to sign a declaration pertaining to alleged juror misconduct and said that he did not want to be further involved*

On August 2, the trial court continued the hearing on the petition for release of juror information. Defense counsel stated the following with respect to Juror No. 2:

> "He gave his information. I then prepared a declaration. We went out and the juror basically did not want to sign or be involved at all. At that point in time, to protect my client's right, we served him with a subpoena to be here mainly because I'm -- I don't know -- at some point in time. I don't think the Court can take a hearsay declaration for a motion for a new trial. I did not want to be in the position of having to keep contacting this person because he expressly desired not to be contacted anymore. And so that's where we left it."

Defense counsel noted that, despite the defense's issuance of a subpoena to Juror No. 2, the juror was not present in court. Defense counsel requested that the court issue a warrant to secure Juror No. 2's presence. The court refused to so.

c. *The August 23 hearing at which the trial court determined that the defense had made a prima facie showing of entitlement to the release of juror information*

On August 23, the trial court held a hearing at which it found that the defense had made a prima facie case for the court to conduct a hearing to determine whether juror personal identifying information should be released. In light of that finding, the prosecutor requested that the jurors be subjected to "an on-the-record direct examination and cross-examination by the parties." The court denied the prosecutor's request, and stated that it was setting a hearing for the purpose of determining whether to release juror identifying information to the defense:

10

"This hearing that I'm setting is just to determine whether or not personal juror identifying information should be released to defense counsel or not. That is it. If any of it is released, I will presume defense counsel is going to ask for a continuance to try to contact the jurors. . . . to formulate a basis for a motion for a new trial, which they are entitled to do, and then we would have a hearing on a motion for a new trial.

"It may be appropriate at that time [—] that jurors are subpoenaed [—] if that is going to be the basis for the motion for a new trial. I will not subpoena the jurors for the hearing that I'm setting now.

The court explained that it would send a notification to all of the jurors concerning the defense's request and that the notification would advise the jurors as to how they could respond to the request:

"The court will send a notice by mail to all the jurors at their last known address via U.S. first class mail, notifying them of the petition that has been filed and the court granting the hearing. They will be notified of all the rights that they are afforded. They can appear in person, by phone, by writing or by counsel. They can object to the release of the information. They can consent to the release of the information. They can agree to be contacted by defense counsel. They can object to be contacted by defense counsel. [¶] The court will give them the option of personally appearing and making their feelings heard."

   d.  *The September 27 hearing*

On September 27, the date sent for the hearing on the release of juror information, the trial judge was unavailable. Another trial judge continued the hearing to September 30.

That same day, the People filed a written motion requesting that, if the court decided to release the juror information to the defense, the court release the information to the People, as well.

11

On September 30, the trial court held a hearing during which the court stated that only one of the 12 jurors, Juror No. 11, had agreed to be contacted by defense counsel. The court stated that it would release Juror No. 11's personal information to the defense.

During the hearing, the court stated that it would deny the People's request to join in the defense's request for the release of juror information. The court noted that the People had not filed any "recognizable motion," seeking the release of juror information. The court added, "[T]he letter that went out to the jurors was informing them the defense counsel wanted their information and if they consent to that and [the letter] never mentioned anything about releasing their information to the prosecution."

The prosecutor responded by requesting that the trial court order the defense to record any juror statement that it obtained from Juror No. 11. Shortly after the court denied that request, the following colloquy occurred:

> "[The prosecutor]: Your Honor, I have one other request that I probably know the answer to before I ask for it, but the People's second request in light of the fact the Court has ruled against a recorded statement is that --
>
> "[The court]: I haven't ruled against a recorded statement, I'm simply allowing the defense to conduct the interview as he wishes. If everyone wants it recorded, then I'm not prohibiting it.
>
> "[The prosecutor]: My record is this, I believe that an unrecorded statement by a defense investigator, if that is going to be the basis for the motion, is unreliable and untrustworthy considering that they have an opportunity to record such a statement.

12

"[The court]: Let me stop you. I'm not ruling on a motion for new trial right now. And if [defense counsel] is simply going to submit declarations from jurors, I don't believe that's going to be sufficient. It's most likely going to be inadmissible hearsay.

"[Defense counsel]: Correct, and just I plan on subpoenaing the . . . jurors as witnesses, and then I kind of went too quick the last time, but it was just -- yes, I don't plan on doing a declaration. And just so counsel is aware, if the juror -- any juror we interview will allow us to tape record them, I will always -- my standing order is to get a tape recorded statement, but the juror -- we do -- I do believe it's proper to advise them you don't have to have it recorded, we would like to record it to make sure we are accurate. And if they say no, then we go with the interview without that.

"[The court]: So I just want to clarify, I'm not -- in this hearing, I'm not stating that any declaration from a juror is going to be admissible on a motion for new trial."

Shortly thereafter, the following colloquy occurred:

"[Defense counsel]: Whatever person I interview, I always say -- tell them that -- not that I ever interview, I might sit in a few, but on jurors, I'm not even there. My investigator goes there and requests permission to talk to them and tell them they don't have to.

"[The court]: Anything else, [Mr. Prosecutor]?

"[The prosecutor:] Is it defense's anticipation to subpoena the witness or the juror in any event or --

"[The court]: Well, as I just ruled or indicated what my ruling will most likely be, a hearsay statement is not going to be admissible evidence, [*sic*] a motion for new trial. So the only way I can foresee testimony would be from a live witness, that being the juror. Then most likely, I assume, [defense counsel], if he believes that juror's testimony is relevant would [*sic*] subpoena them [*sic*] for motion for new trial.

"[Defense counsel]: Correct."

13

### f. *Johnson's motion for new trial*

In November 2019, Johnson filed a motion for new trial based on alleged juror misconduct. In his motion, Johnson argued that, "[a]fter the trial, at least [two] jurors have stated that the jurors were speaking in the deliberation room about the defendant not testify[ing] and wanted to know why he didn't testify." Johnson also stated that one juror "made it very clear that [other jurors] were trying to convict the defendant because of his skin color." Johnson stated that this juror indicated that "the jurors had no problem talking race."

Together with the motion for new trial, Johnson lodged a declaration from defense counsel that stated in relevant part:

> "On March 6, 2019, the jurors returned a verdict of guilty against [Johnson]. While the verdict was read, a few jurors seemed upset. After seeing the juror [*sic*] was so upset the defense investigator went to contact some jurors. [¶] In speaking with Juror [No. 2], he made a number of startling statements regarding the subject of their deliberations. First, he stated that he was appalled by some of the behaviors and views of the jurors. He stated that some of the jurors decided Mr. Johnson was guilty before starting deliberations because of the color of Mr. Johnson's skin. Also some of the jurors stated they were prejudiced against Mr. Johnson because of the color of his skin. Additionally, the jurors discussed and considered the fact Mr Johnson did not testify.

> "Attached as an exhibit in this motion is a declaration of the [defense] investigator . . . who interviewed Juror [No. 2].

> "Juror [No. 2] did not sign a sign declaration but was subpoenaed to testify to court on 11-22-19.

> "The [i]nvestigator also interviewed another juror after the release of the juror's name and that juror stated that the jury discussed in depth that the defendant did not testify.

14

The juror was also subpoenaed to come to court on 11-22-19."

Johnson attached the defense investigator's declaration pertaining to the investigator's interview of Juror No. 2 in May 2019. (See pt. III.A.1.a, *ante*.)

### g. *The People's opposition*

The People filed an opposition to the motion for new trial. In their opposition, the People argued that case law established that nonjuror affidavits, even if they purport to be based upon statements made by a juror or other percipient witness, cannot support an effort to overturn a jury's verdict. In addition, the People argued that case law established that a trial court does not abuse its discretion in denying a defendant's request for an evidentiary hearing on a motion for new trial based on juror misconduct when the evidence proffered in support of the motion constitutes hearsay. Thus, the People argued that Johnson had made an insufficient showing to support either the holding of an evidentiary hearing into possible juror misconduct or the granting of the defendant's motion for new trial. In describing the insufficiency of Johnson's motion for new trial, the People argued:

> "The defendant's moving papers for a new trial did not provide sworn affidavits from either of the jurors allegedly interviewed by the defense. Any [unsworn], unreliable and inadmissible hearsay statements are not a basis for a finding [of] actual misconduct. The entire point of releasing juror information is to allow the parties to contact consenting jurors in order to obtain signed and sworn affidavits to provide the court as evidence. Providing affidavits would give the court admissible evidence to consider whether misconduct actually took place. Since the defendant failed to include any affidavits by any jurors this court cannot make a finding that misconduct actually took place."

h. *The November 22 hearing at which the trial court denied both Johnson's request for an evidentiary hearing on his motion for new trial and the motion for new trial*

The trial court held a hearing on Johnson's motion for a new trial on November 22.

At the outset of the hearing, defense counsel stated that he had issued subpoenas to Juror No. 2 and Juror No. 11 to secure their presence at the November 22 hearing. Defense counsel explained that the defense was requesting an evidentiary hearing on the motion for new trial because both Juror No. 2 and Juror No. 11 had informed the defense that the jury had discussed Johnson's failure to testify. Defense counsel contended that the information obtained by the defense was "enough for the court . . . to conduct an evidentiary hearing."

With respect to the fact that Johnson had not lodged any juror affidavits in support of the motion for new trial, defense counsel stated the following:

> "I was mindful of the last time we were here. We had this discussion on the record regarding that competent evidence for a hearing such as this is no longer a declaration or be [*sic*] affidavits, that the witnesses are themselves; hence, I subpoenaed in those two individuals with a good-faith belief that they had information that would warrant a motion or the court to consider a motion for a new trial."

Immediately thereafter, the following colloquy occurred:

> "[The court]: Before I hear from [the prosecutor], a few questions for you, [defense counsel]. Juror No. 11, unless I missed it, I didn't see any written statement by anyone regarding what Juror No. 11 supposedly said.

> "[Defense counsel]: I did not submit only because -- and I apologize to the court if I misunderstood. When we -- I did put it in my declaration. [The defense investigator] did interview him. [¶] I will tell the court as an offer of proof,

16

that individual also said that numerous times, the fact my client didn't testify was brought up in front of the jury.

"After the last hearing when the court -- there was a discussion on the record about having hearsay declarations, I felt that the -- I got at least an indicated or an idea from the court that we needed to hear from the people themselves. Hence, that's why I didn't add that to it. I do have a statement from [the defense investigator] regarding what was said, but I did not file that statement.

"[The court]: Did Juror No. 11 verify that written statement that [the defense investigator] wrote? Did he declare under penalty of perjury that the statement is true and correct?

"[Defense counsel]: We -- I did not ask for an affidavit from the -- from the juror itself [*sic*]. This took place after the hearing we talked about and there was a concern as to -- and [the prosecutor] brought up a concern about bringing in what is [*sic*] hearsay statements, even an affidavit by the witness. [¶] We interviewed the witness. He was immediately subpoenaed or subpoenaed sometime thereafter once the determination was he had anything of value.

"[The court]: And, additionally, Juror No. 2 never submitted an affidavit under oath?

"[Defense counsel]: That is correct, your honor. I will tell the court on Juror No. 2, we did go out after he was interviewed. He expressed a desire not to be contacted anymore. And so immediately upon being told that, my investigator -- I've instructed my investigator that if a juror were to say don't contact, immediately to leave. The only further contact they had was to subpoena, and that's the only other contact. So we didn't even attempt to get an affidavit any further once they said no."

The prosecutor argued that the defense had ample time to submit juror declarations in support of its motion for new trial and had failed to do so. The prosecutor argued further that case law established that "an evidentiary

hearing is not a matter of right," and that the defense had presented nothing to the court that justified holding such a hearing.

After further argument from the defense, the trial court denied the request for an evidentiary hearing and denied the motion for new trial. The trial court ruled:

> "The court rendered its verdict on the priors that were alleged on March 13, 2019. [The] [d]efense has had since that time to fully investigate and put forth evidence as to why there should be a new trial in this case, which included more than enough time to interview the jurors in this case who wish to be interviewed, to gather statements from those jurors, to gather affidavits from those jurors if they were willing to swear under penalty of perjury that their statements to the investigator were true. [¶] The defense has failed to present any affidavits from any jurors in this case.
>
> "The defense has only presented one actual written statement from [the defense] investigator . . . regarding Juror No. 2. No written statement regarding what Juror No. 11 allegedly said has ever been provided to the court, either sworn or unsworn.
>
> "So first I will turn to the statement that Juror No. 2 allegedly made to [the] investigator . . . , one or two statements that the juror allegedly made. Quote, 'the older white female jurors had already decided the defendant was guilty based on his skin color,' unquote, and, quote, 'he refused to side with the others who were being prejudiced and trying to convict a man based on his skin tone,' unquote.
>
> "In this case, the defendant is clearly a fair-skinned white male. Those alleged statements by that juror make no sense. They are not believable.
>
> "The incredibleness of those statements taint any other statements that the juror may have allegedly made to [the] investigator . . . , and I do not find his statement made to

18

[the investigator] to be believable on its face just from reading the written statement of [the investigator] alone.

"Additionally, as previously stated, [J]uror No. 2 did not verify that his statements to [the investigator] were true.

"Turning to Juror No. 11 who allegedly made a statement to [the investigator] at some point in time, we have no written statements.  We have [defense counsel] stating in his declaration allegedly what Juror No. 11 stated to [the investigator] in a statement.  That is woefully inadequate and obviously not a verified statement under oath.

"The court finds that what the defense has presented thus far is woefully inadequate for the court to go forward with any type of evidentiary hearing, despite the fact that one of the jurors, Juror No. 2, was subpoenaed and is present in the courthouse.

"The defense has failed to present any admissible evidence demonstrating a strong possibility that prejudicial misconduct has occurred in this trial.  Therefore, the court denies the defense motion for a new trial.  And I also quash any subpoenas that were previously issued to the jurors in this case."

2. *Governing law and the applicable standards of review*

    a. *The law governing a defendant's request for an evidentiary hearing on a motion for new trial based on juror misconduct*

" 'The trial court has the discretion to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing.  [Citation.]  Defendant is not, however, entitled to an evidentiary hearing as a matter of right.  Such a hearing should be held only when the court concludes an evidentiary hearing is "necessary to resolve material, disputed issues of fact."  [Citation.]  "The hearing should not be used as a 'fishing expedition' to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has

19

occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." ' " (*People v. Peoples* (2016) 62 Cal.4th 718, 777.)

With respect to the type of evidence that will trigger a trial court's duty to conduct an evidentiary hearing into potential juror misconduct, the California Supreme Court has repeatedly held, " 'Hearsay evidence offered in support of a new trial motion that is based on alleged jury misconduct ordinarily is insufficient to establish an abuse of discretion in either denying the motion or declining to conduct an evidentiary hearing.' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 517 (*Mora and Rangel*); see, e.g., *People v. Manibusan* (2013) 58 Cal.4th 40, 55 (*Manibusan*); *People v. Dykes* (2009) 46 Cal.4th 731, 810; *People v. Hayes* (1999) 21 Cal.4th 1211, 1255 (*Hayes*).) In *Mora and Rangel*, the Supreme Court described the court's prior decisions establishing this principle:

> "As we acknowledged in *Hayes* and have reiterated many times, hearsay is ordinarily 'not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct.' [Citation.] In *Hayes*, because the only evidence of juror misconduct was the statement of counsel regarding purported out-of-court statements by a juror who did not herself provide any declaration, we concluded the trial court did not abuse its discretion in denying a motion for a new trial." (*Mora and Rangel*, at pp. 517–518.)

In *Manibusan*, *supra*, 58 Cal.4th at page 59, the defendant offered a defense investigator's sworn declaration in which the investigator "stated in relevant part: (1) Juror No. 58 'told [the investigator] that jurors talked about the fact the defendant did not testify' and (2) Juror D.S. 'stated that jurors discussed the fact that defendant . . . did not testify.' " In concluding that the trial court had not abused its discretion in declining to conduct an

20

inquiry into such misconduct, the *Manibusan* court succinctly reasoned, "The defense investigator's declaration is hearsay, which, as earlier explained, ordinarily is insufficient to establish an abuse of discretion in denying a motion for new trial or conducting in evidentiary hearing based on alleged jury misconduct. [Citation.] Again, defendant offers no persuasive basis for deviating from this general rule." (*Ibid.*)

" 'We review for abuse of discretion the trial court's denial of defendant's postverdict request for an evidentiary hearing into allegations of jury misconduct.' " (*People v. Avila* (2006) 38 Cal.4th 491, 604.)

### b. *Section 1202*

Section 1202 provides in relevant part:

> "If the court shall refuse to hear a defendant's motion for a new trial or when made shall neglect to determine such motion before pronouncing judgment or the making of an order granting probation, then the defendant shall be entitled to a new trial."

We assume for purposes of this decision that we apply the de novo standard of review with respect to whether the trial court "refuse[d] to hear [the] defendant's motion for a new trial," within the meaning of section 1202.[7]

### 3. *Application*

#### a. *The trial court did not abuse its discretion in denying Johnson's request for an evidentiary hearing on his motion for new trial based on juror misconduct*

Citing some of the case law discussed *ante*, Johnson acknowledges that "unsworn hearsay is not sufficient to trigger an evidentiary hearing on an allegation of juror misconduct." However, he contends that that the "unusual

---

[7] Neither party has cited, and our own research has not revealed, any case law with respect to the applicable standard of review as to this issue.

facts and circumstances of this case," required the trial court to "deviate from the general rule." In support of this contention, Johnson points to certain statements that the trial court made at the September 30 hearing that he claims "led defense counsel to believe [he] was not required to support [Johnson's] new trial motion with juror affidavits or declarations."

Specifically, Johnson argues that the "the trial court stated, on the record, that it did not believe juror declarations would be sufficient to support the motion." The specific statements from the trial court on which Johnson appears to be relying are the following:

> "I'm not ruling on a motion for new trial right now. . . . [I]f [defense counsel] is simply going to submit declarations from jurors, I don't believe that's going to be sufficient. It's most likely going to be inadmissible hearsay"; and

> "I'm not stating that any declaration from a juror is going to be admissible on a motion for new trial." (See pt. III.A.1.e, *ante*.)

In other words, the trial court stated that juror declarations likely would not constitute a sufficient basis for the court *to grant a new trial* and that juror declarations might not be admissible to support a motion for a new trial. Johnson fails to establish that either statement is legally incorrect or improper.

In fact, both statements are legally correct. The defense's submission of juror declarations would not necessarily entitle Johnson to a new trial, or even to an evidentiary hearing on a motion for new trial. (See, e.g., *Manibusan*, *supra*, 58 Cal.4th at p. 59 [trial court did not abuse discretion in declining to hold evidentiary hearing on juror misconduct despite juror declaration indicating that "the jurors discussed defendant's failure to testify"].) It is also clear that a juror's declaration might be inadmissible on a motion for new trial. (See *id.* at p. 57 ["Regarding Juror A.G.'s declaration, it

22

was inadmissible—and thus insufficient to establish an abuse of discretion—insofar as it purported to state, or speculate on, the effect of the information on his own and other jurors' subjective reasoning processes." (Evid. Code, § 1150.)].)[8]

Johnson also notes that, while discussing the defense investigator's interviewing of jurors, the prosecutor asked whether the defense would "subpoena the witness or the juror" The trial court interrupted the prosecutor and stated that the court had indicated that it was "likely" that "a hearsay statement is not going to be admissible evidence, [on] a motion for new trial," and that the only testimony that the court could foresee hearing would be from a juror. In addition, the trial court stated that it assumed that if defense counsel "believes that [a] juror's testimony is relevant [defense counsel] would subpoena [the juror] for [a] motion for new trial." However, at no time did the court state that it would hold an evidentiary hearing on

---

[8]    Evidence Code section 1150 provides:

> "(a) Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.

> "(b) Nothing in this code affects the law relating to the competence of a juror to give evidence to impeach or support a verdict."

Johnson's motion for new trial even in the *absence* of any juror declarations attesting to instances of juror misconduct.[9]

With respect to the November 22 hearing on the motion for new trial, while Johnson notes that defense counsel apologized if he "misunderstood," whether counsel should lodge "a statement from [the defense investigator], regarding what [Juror No. 11] said," any such misunderstanding does not demonstrate reversible error. The law is plain that, even assuming that defense counsel *had* submitted a statement from the *defense investigator* as to Juror No. 11's alleged statements, the trial court would not have been obligated to hold an evidentiary hearing based on such a hearsay declaration. (See, e.g., *Mora and Rangel*, *supra*, 5 Cal.5th at pp. 517–518.)

In addition, when the trial court asked defense counsel at the November 22 hearing on the motion for new trial whether *Juror No. 11* had verified the statements attributed to him by the defense investigator, defense counsel acknowledged, "I did not ask for an affidavit from the -- from the juror itself [*sic*]." While defense counsel suggested that his decision not to seek an affidavit from Juror No. 11 was based on the *prosecutor's* expression

---

9     As recounted in part III.A.1.e, *ante*, the verbatim colloquy is as follows:

> "[The prosecutor:] Is it defense's anticipation to subpoena the witness or the juror in any event or --
>
> "[The court]: Well, as I just ruled or indicated what my ruling will most likely be, a hearsay statement is not going to be admissible evidence, [*sic*] a motion for new trial. So the only way I can foresee testimony would be from a live witness, that being the juror. Then most likely, I assume, [defense counsel], if he believes that juror's testimony is relevant would [*sic*] subpoena them [*sic*] for motion for new trial."

24

of "a concern about bringing in what [are] hearsay statements, even an [*sic*] affidavit by the witness," neither the prosecutor, nor the trial court, ever stated that the defense would be entitled to an evidentiary hearing on a motion for new trial absent admissible evidence of juror misconduct. In any event, defense counsel could not have reasonably relied on the *prosecutor's* statements, particularly after the prosecutor filed an opposition to the motion for new trial that stated the following:

> "Additionally, the defense failed to provide a signed affidavit from the consenting juror [No. 11] whose identity was disclosed to only the defense. The purpose behind disclosure of juror's identities is to allow the parties the opportunity to interview jurors and produce signed and sworn affidavit[s] alleging misconduct. The defendant failing to obtain a sworn affidavit from the consenting juror then simply subpoenaing him to appear in court is nothing more than the 'fishing expedition' that the [*People v. Hedgecock* (1990) 51 Cal.3d 395] court sought to preclude."

Because defense counsel did not submit juror declarations in support of his request for an evidentiary hearing on his motion for new trial based on juror misconduct, we conclude that the trial court did not abuse its discretion in denying Johnson's request for an evidentiary hearing on his motion.

      b. *The trial court did not refuse to hear Johnson's motion for new trial*

Johnson argues, "[T]he trial court's denial of the defense's request for an evidentiary hearing" was "tantamount to a refusal to hear the new trial motion." We disagree. For the reasons discussed in part III.A.3.a, *ante*, we reject Johnson's contention that the trial court's comments at the September 30 hearing obligated the court to hold an evidentiary hearing on Johnson's motion for new trial. Further, as Johnson acknowledges on appeal, the trial court expressly "denied" his motion for new trial.

Accordingly, we conclude that the court did not "refuse to hear [Johnson's] motion for a new trial." (§ 1202.)

B. *Johnson has not established that defense counsel provided ineffective assistance in failing to obtain and file juror affidavits in support of Johnson's motion for new trial*

Johnson argues, in the alternative, that his counsel was "prejudicially ineffective in failing to obtain and file juror affidavits for purposes of the new trial motion based on juror misconduct."

1. *Governing law*

To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 689; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

2. *Application*

Johnson argues that "[n]o 'plausible tactical explanation can be conceived' [citation] for defense counsel's failure to follow the law and obtain and submit the supporting declarations/affidavits." Johnson's claim fails because he has not established that *any* jurors were willing to provide a declaration or affidavit in support of his motion for new trial. With respect to Juror. No. 2, at the August 2 hearing, defense counsel stated the following:

> "[Juror No. 2] gave his information. I then prepared a declaration. We went out and the juror basically did not want to sign or be involved at all."

26

Johnson points to nothing else in the record establishing that Juror No. 2 was willing to sign a declaration in support of Johnson's motion.

Similarly, there is nothing in the record establishing that defense counsel could have obtained a declaration from Juror No. 11 attesting to juror misconduct. While defense counsel issued a subpoena for Juror No. 11 to appear at the hearing on the motion for new trial, defense counsel indicated that Juror No. 11 "was . . . not present." Juror No. 11's failure to appear in court in response to a defense subpoena supports the inference that Juror No. 11 was unwilling to provide testimony or a declaration in support of Johnson's motion for new trial.

Thus, a plausible basis exists in the record for defense counsel's failure to provide juror declarations or affidavits in support of Johnson's motion for new trial, i.e., the lack of any jurors willing to provide a declaration.[10] Accordingly, we conclude that Johnson's claim of ineffective assistance of counsel fails because he cannot establish that defense counsel lacked a rational basis for failing to support Johnson's motion for new trial with juror declarations or affidavits.

C. *There is not substantial evidence in the record to support the trial court's true findings that three of Johnson's prior Illinois convictions constitute serious felonies under California law*

Johnson claims that the trial court erred in concluding that his Illinois aggravated robbery conviction in case No. 09CR0561101 and his Illinois vehicular hijacking convictions in case Nos. 07CR0027601 and 09CR0562901 constitute serious felonies (§§ 1192.7 (c), 667, subd. (d)) for purposes of

---

[10] Johnson does not suggest that any other juror was willing to provide a declaration or affidavit in support of his motion for new trial.

27

California's Three Strikes law (§§ 667, subds. (b)–(i); 1170.12) and serious felony enhancement statute (§ 667, subd. (a)(1)).

1. *Governing law*

    a. *The Three Strikes law and the serious felony enhancement statute*

California's Three Strikes law (§§ 667, subds. (b)–(i); 1170.12) and its serious felony enhancement statute (§ 667, subd. (a)(1)) provide for enhanced sentences for recidivist offenders. A defendant who has previously suffered a conviction for a "serious felony" as defined in section 667, subdivision (d) and section 1192.7, subdivision (c) is subject to an enhanced sentence under certain circumstances. Robbery (§ 211) and carjacking (§ 215) are both serious felonies. (§ 1192.7, subd. (c)(19) (robbery), (c)(27) (carjacking).)

With respect to prior convictions from jurisdictions other than California, section 667, subdivision (d)(2) and section 1170.12, subdivision (b)(2) provide that a "serious felony" includes:

> "A prior conviction in another jurisdiction for an offense that, if committed in California, is punishable by imprisonment in the state prison constitutes a prior conviction of a particular serious . . . felony if the prior conviction in the other jurisdiction is for an offense that includes all of the elements of a particular . . . serious felony as defined in subdivision (c) of Section 1192.7."

    b. *Case law pertaining to the determination of whether a prior conviction constitutes a serious felony*

In *People v. McGee* (2006) 38 Cal.4th 682 (*McGee*) disapproved of by *Gallardo, supra,* 4 Cal.5th 120, the California Supreme Court considered the manner by which a California sentencing court could determine whether a defendant's prior Nevada robbery conviction constituted a serious felony

28

under California law.[11]  The *McGee* court concluded that it was permissible for the sentencing court to examine the record of the prior conviction and "ascertain whether that record reveals whether the conviction realistically may have been based on conduct that would not constitute a serious felony under California law." (*McGee,* at p. 706.)

In *Gallardo*, *supra*, 4 Cal.5th 120 the California Supreme Court reexamined the scope of "judicial factfinding" permissible when a sentencing court determines the nature or basis of a prior conviction for purposes of considering whether to subject a defendant to an enhanced sentence.  (*Id.* at p. 136.)  The *Gallardo* court concluded:

> "The judicial factfinding permitted under the [*Almendarez-Torres v. United States* (1998) 523 U.S. 224] exception [to a defendant's Sixth Amendment right to a jury trial] does not extend 'beyond the recognition of a prior conviction.' [Citation.]  Consistent with this principle, and with the benefit of further explication by the high court, we now hold that a court considering whether to impose an increased sentence based on a prior qualifying conviction may not determine the 'nature or basis' of the prior conviction based on its independent conclusions about what facts or conduct 'realistically' supported the conviction. [Citation.]  That inquiry invades the jury's province by permitting the court to make disputed findings about 'what a trial showed, or a plea proceeding revealed, about the defendant's underlying conduct.' [Citation.]  The court's role is, rather, limited to identifying those facts that were established by virtue of the conviction itself—that is, *facts* the jury was necessarily required to find to render a guilty verdict, or *that the defendant admitted* as the factual basis for a guilty plea." (*Id.* at p. 136, italics added.)

---

11     The *McGee* court explained that the elements of robbery under Nevada law differed from the elements of robbery under California law, including that in Nevada "robbery requires only *general* criminal intent," (*McGee*, *supra*, at p. 688), while under California law, "robbery requires a *specific* criminal intent to permanently deprive another person of property." (*Ibid.*)

29

In disapproving *McGee*, the *Gallardo* court stated, "We are persuaded that the approach sanctioned in *McGee* is no longer tenable insofar as it authorizes trial courts to make findings about the conduct that 'realistically' gave rise to a defendant's prior conviction." (*Gallardo*, *supra*, 4 Cal.5th at p. 134.) Instead, as the *Gallardo* court explained, "[t]he trial court's role is limited to determining the facts that were necessarily found in the course of entering the conviction." (*Ibid.*)

c. *Robbery and carjacking under California law*

As the *McGee* court referenced, under California law, robbery requires that a defendant have the specific criminal intent to permanently deprive another person of property, among other elements. (*McGee*, *supra*, 38 Cal.4th at p. 688, citing *People v. Avery* (2002) 27 Cal.4th 49, 52.) Carjacking, under California law, requires that a defendant have the specific intent to temporarily or permanently deprive the victim of possession of the vehicle, among other elements. (*People v. Magallanes* (2009) 173 Cal.App.4th 529, 534.)

d. *Robbery and vehicular carjacking under Illinois law*

As the People forthrightly acknowledge, "[i]n Illinois, robbery is a general intent offense; specific intent to permanently deprive is *not* an element of the crime. (*People v. Banks* (1979) 75 Ill.2d 383, 385–393 [388 N.E.2d 1244].)" (Italics added.) Aggravated robbery, under Illinois law, is a robbery committed by various statutorily defined methods (see 720 Ill. Comp. Stat. Ann. 5/18-1), and thus does not require proof of an intent to deprive.

The People also acknowledge that Illinois's vehicular hijacking and aggravated vehicular hijacking statutes "do not mention any intent to deprive and Illinois courts have observed that, like the robbery laws, they

30

'articulate[ ] no specific mental state.'  (*People v. Aguilar* (1997) 286
Ill.App.3d 493, 498 [676 N.E.2d 324].)"

   2.   *Factual and procedural background*

      a.   *The allegations*

In the second amended information, the People alleged that Johnson
had suffered the following four prior Illinois convictions, each of which
constituted a serious felony within the meaning of section 667, subdivision
(a)(1):

| Prior Illinois Convictions | Date of Conviction | Case Number |
|---|---|---|
| 1. Attempted Armed Robbery[12] | 08/09/2005 | 04CR1883101 |
| 2. Aggravated Vehicular Hijacking | 01/19/2011 | 07CR0027601 |
| 3. Aggravated Robbery | 01/19/2011 | 09CR0561101 |
| 4. Vehicular Hijacking | 01/19/2011 | 09CR0562901 |

The People alleged that the same four convictions also constituted
strikes pursuant to the Three Strikes law (§§ 667, subd. (b)–(i), 1170.12).[13]

      b.   *The People's evidence*

During a court trial on the prior conviction allegations, the People
offered fingerprint cards, certified court documents from Cook County,

---

[12]   As the trial court noted when rendering its findings on the prior
conviction allegations, the second amended information alleged *two* prior
convictions as the first serious felony prior.  The court stated that it would
treat the attempted armed robbery conviction from case No. 04CR1883101
referenced in the text as the first alleged serious felony.  As noted in part I,
*ante*, Johnson does not raise any challenge to the trial court's strike and
serious felony findings as to the findings premised on the attempted armed
robbery conviction from case No. 04CR1883101.

[13]   For ease of reference, we refer to the priors as the first, second, third,
and fourth serious felony conviction allegations.

Illinois, and expert testimony, demonstrating that Johnson was the person who had suffered the Illinois convictions.

The People also presented evidence concerning the facts underlying the convictions. Specifically, with respect to the second, third and fourth serious felony conviction allegations, the People offered in evidence a certified court transcript of the plea colloquies during which Johnson pled guilty to aggravated robbery (case No. 09CR0561101), aggravated vehicular hijacking (case No. 07CR0027601), and vehicular hijacking (case No. 09CR0562901).

With respect to the second serious felony conviction allegation pertaining to Johnson's aggravated vehicular hijacking conviction in case No. 07CR0027601, the People presented evidence that Johnson stipulated to the following as the factual basis for his plea: On November 25, 2006, Richard C. (Richard) was working at a mall. Richard agreed to give Johnson and his companion, Renee Goode and her infant daughter a ride. Johnson got into the front passenger seat of Richard's car; with Goode and the infant in the backseat. Richard began to drive. After a while, Johnson told Richard to pull over. Johnson took out a knife, pointed it at Richard's chest, and ordered him to empty his pockets. When Richard did, Johnson took the items that had been in the pockets, including $20 in cash, and handed them to Goode. At knifepoint, Johnson ordered Richard to get out of the car and threatened to kill Richard. Johnson climbed into the driver's seat and pushed Richard out of the vehicle. Richard tried to hang on, but lost his footing and fell. Johnson drove over Richard, breaking his wrist, and drove away. A few days after the attack, Johnson led police on a high-speed chase in Richard's vehicle before being arrested.

With respect to the third serious felony conviction allegation, pertaining to Johnson's robbery conviction in case No. 09CR0561101,

Johnson stipulated to the following: On January 12, 2009, Christian R. (Christian) was walking on the sidewalk when Johnson approached him. Johnson asked Christian for money. When Christian replied that he did not have any, Johnson said, " 'I got a fuck'n gun in my pocket. Either give me your wallet or I'll shoot you.' " In response, Christian gave Johnson his wallet, which contained between $20 and $24. Johnson directed Christian to keep walking away.

With respect to the fourth serious felony conviction allegation, pertaining to Johnson's vehicular hijacking conviction in case No. 09CR0562901, the factual basis for Johnson's plea included the following: Steven B. (Steven) was driving his car when he picked up Johnson. Johnson convinced Steven to drive Johnson to Johnson's mother's home. During the drive, Steven stopped at an ATM and withdrew $60. Thereafter, Johnson directed Steven to stop the car. Johnson removed the keys from the car, and took the $60 from Steven while threatening to cut Steven with a knife. Steven got out of the car. Johnson drove the car away without Steven's permission.

c. *The trial court's findings*

The trial court found that Johnson was the person who suffered all of the prior Illinois convictions. With respect to the second (case No. 07CR0027601) and third (case No. 09CR0561101) serious felony conviction allegations, the trial court found that the record of conviction for the Illinois priors demonstrated that the facts of the offenses included all of the elements of section 211 (robbery). With respect to the fourth serious felony conviction allegation (case No. 09CR0562901), the trial court found that the record of conviction for the Illinois prior demonstrated that the facts of the offenses

33

included all of the elements of section 211 (robbery) and section 215, subdivision (a) (carjacking). The trial court reasoned in relevant part:

> "I will note . . . *there was no direct, specific, explicit evidence* that mentioned two of the requisite elements in carjacking and robbery, as the California statute lists those elements. That would be for Penal Code Section 215(a), carjacking, that the defendant took a motor vehicle that was not his own, it was not specifically stated that the vehicle was not his own; and . . . that when the defendant used force or fear to take the vehicle, he intended to deprive the other person of possession of the vehicle, either temporarily or permanently.

> "As to Penal Code Section 211, robbery, there was not specific, explicit direct evidence as to the first element that the defendant took property that was not his own; and element 6, when the defendant used force or fear, he intended to deprive the owner of the property permanently or to remove the property from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property. However, the Court finds that *the only reasonable inference* that can be drawn from the record of conviction is that those elements were present in the factual basis for each of the serious felony priors that have been alleged, and therefore I do, as previously stated, find that all the elements of the California statutes have been met." (Italics added.)

3. *Application*

In light of the law discussed in part III.B.1, *ante*, whether Johnson's Illinois convictions for aggravated robbery, aggravated vehicular hijacking, and vehicular hijacking qualify as serious felonies under California law is dependent on whether the trial court properly found that each conviction constitutes a robbery (§ 211) and/or a carjacking (§ 215) under California law, both of which are serious felonies. (See §§ 667, subd. (d), 1170.12, subd. (b).)

34

None of the Illinois offenses of which Johnson was convicted at issue required proof of that he had any specific intent. (See pt. III.C.1.d, *ante*.) In contrast, in California, both robbery and carjacking require proof that a defendant harbored a requisite specific intent. (See pt. III.C.1.c, *ante*.) Specifically, with respect to robbery, there must be proof that the defendant intended to permanently deprive another person of property (see *McGee*, *supra*, 38 Cal.4th at p. 688), and with respect to carjacking, there must be proof that the defendant intended to temporarily or permanently deprive the victim of possession of the vehicle (see *Magallanes*, *supra,* 173 Cal.App.4th at p. 534.) Thus, in Illinois, convictions for aggravated robbery, aggravated vehicular hijacking, and vehicular hijacking can be based on conduct that under California law would not be either a robbery or a carjacking and therefore, would not qualify as a serious felony.

For example, if Johnson lacked the specific intent to deprive the victim of his property due to intoxication, he could still be found guilty of the *Illinois* offense of robbery (since robbery is a general intent crime in Illinois), but he would not be guilty of a *California* robbery (since robbery is a specific intent crime in California). (Compare *People v. Rosas* (Ill.App.Ct. 1981) 102 Ill.App.3d 113, 116 [stating that intoxication is *not* a defense to robbery under Illinois law because it is a general intent crime] with *People v. Page* (1980) 104 Cal.App.3d 569, 575 ["The crime of robbery requires a specific intent to permanently deprive the owner of the property. [Citation] If the jury believed appellant was too intoxicated to form the requisite intent, it would be required to acquit him of that charge."].)

The People do not contend otherwise. The People acknowledge that, with respect to the Illinois and California robbery statutes in question, the "elements are not the same." Similarly, the People acknowledge that the

35

Illinois vehicular hijacking and California carjacking statutes differ given the "the absence of the 'intent to deprive' element in the [Illinois] statute."

The People argue instead that the plea colloquies of the prior convictions demonstrate that Johnson had the requisite specific intent. For example, with respect to the Illinois aggravated robbery conviction, the People argue "[a]s the trial court found, it is clear from appellant's ordering of Christian to walk away at gunpoint that appellant intended to permanently deprive Christian of his wallet." With respect to the vehicular hijacking convictions, the People argue that "the fact that [Johnson] drove away in the vehicles, in both instances forcefully, shows that he intended to at least temporarily, if not permanently, deprive the victims of possession of those vehicles." The trial court employed a similar analysis, stating that although "direct, specific, explicit evidence . . . [of] two of the requisite elements in carjacking and robbery, as the California statute lists those elements" was lacking, the court "finds that the only reasonable inference that can be drawn from the record of conviction is that those elements were present."

While this reasoning is logical and in our view, eminently sensible under the circumstances of this case, we are constrained to conclude that it does not comport with the dictates of *Gallardo*. Even assuming that the trial court was correct in stating that "only reasonable *inference*" from the Illinois plea colloquies was that Johnson harbored the requisite intent under California law, the Sixth Amendment as interpreted by *Gallardo* precludes a California sentencing court from engaging in " 'judicial factfinding that goes beyond the recognition of a prior conviction' " when considering whether to impose an enhanced sentence. (*Gallardo*, *supra*, 4 Cal.5th at p. 134, italics added in first quote.) Under *Gallardo*, "the court's role is, rather, limited to identifying those facts that were *established* by virtue of the conviction

36

itself—that is, *facts* the jury was necessarily required to find to render a guilty verdict, or *that the defendant admitted* as the factual basis for a guilty plea." (*Id.* at p. 136, italics added.) There was no prior jury trial and there is nothing in any of the plea colloquies from the prior convictions amounting to admissions from Johnson as to his specific intent in committing any of the Illinois offenses.[14] This is unsurprising because Illinois law did not require Johnson to have intended to permanently deprive the victim of his property in order to be guilty of robbery or that Johnson have intended to temporarily or permanently deprive the victims of their vehicles in order to be guilty of vehicular hijacking.

While we have no quarrel with the reasonableness of the inferences that the trial court drew based on the record of Johnson's convictions, under *Gallardo*, reasonableness is not the measure. (See *Gallardo*, *supra*, 4 Cal.5th at p. 124 ["the court may *not* rely on its own independent review of record evidence to determine what conduct 'realistically' led to the defendant's conviction" (italics added)].) Because there is nothing in any of the pleas colloquies, nor in the records of conviction generally, specifying "that the defendant admitted" (*Id.* at p. 136) having had the specific intent to deprive — an intent not required to be found guilty under Illinois law — *Gallardo* makes clear that there is not substantial evidence to support the court's findings that Johnson's convictions meet the elements of robbery and carjacking in California. We therefore are compelled to conclude that there is not substantial evidence in the record to support the trial court's true findings that Johnson's prior Illinois convictions in case Nos. 09CR0561101,

---

14 The People do not cite to any such admissions in their briefing on appeal and our review of the record reveals no such admissions.

07CR0027601 and 09CR0562901 constitute serious felonies under California law for purposes of the strike and serious felony enhancement allegations.

Although Johnson requests that we vacate his sentence and remand for resentencing upon reversal of the trial court's true finding on the Illinois prior convictions, we conclude that the People should be afforded the opportunity to retry the reversed strike and serious felony enhancement allegations if they are be able to obtain additional evidence[15] and choose to retry Johnson on the allegations. (See *Gallardo, supra*, 4 Cal.5th at p. 139 [reversing and remanding "to permit the People to demonstrate to the trial court, based on the record of the prior plea proceedings, that defendant's guilty plea encompassed a relevant admission about the nature of [his] crime"].)

---

[15] The existence of such evidence would seem unlikely given that the People have already submitted the plea colloquy transcripts, but we decline to categorically preclude the People from retrying Johnson on the strike and serious felony enhancement allegations.

## IV.

## DISPOSITION

The judgment is reversed with respect to the trial court's true findings on the strike and serious felony enhancement allegations pertaining to case Nos. 09CR0561101, 07CR0027601 and 09CR0562901.  The matter is remanded to the trial court for the limited purpose of retrying the prior strike and serious felony conviction allegations pertaining to case Nos. 09CR0561101, 07CR0027601 and 09CR0562901 if the People so elect, and thereafter resentence Johnson.  Following resentencing, the trial court shall prepare a new abstract of judgment and forward a certified copy of the abstract to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


AARON, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.

39